(No. 39334.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, *vs.* JERRY BARBEE, Appellee.

*Opinion filed Sept. 23, 1966.—Rehearing denied Oct. 27, 1966.*

JAY A. SCHILLER, of Chicago, for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE and KENNETH L. GILLIS, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

The defendant, Jerry Barbee, waived a jury trial, and after a trial before the court he was found guilty of the theft of an automobile, and sentenced to a term of imprisonment of not less than four nor more than six years. On this appeal, he does not challenge the sufficiency of the evidence to establish his guilt beyond a reasonable doubt. His principal contention is that the trial court erroneously overruled his motion to suppress evidence concerning the stolen automobile, which was seized from his garage without a valid search warrant.

At the hearing on the defendant's motion to suppress, officer Thomas Clifford of the Chicago Police Department testified that at approximately 1 :00 A.M. on October 31, 1962, as he was driving a squadcar south on Artesian Avenue in Chicago, he "heard two loud reports and upon turning saw a man fire a small arm revolver, aimed in my direction * * *." The man who had fired the shots started running north along Artesian Avenue. Another man ran from a 1957 Ford automobile, parked at the curb, and joined him. The two men ran between two houses. Officer Clifford radioed for assistance. A search for the men who had fled from the car was unproductive. Officer Joseph Gorman testified that he and officer Clifford searched the car and that in the glove compartment he found a registration card showing that the automobile belonged to Barry Barbarish of Center, Alabama. He also found "two slips

* * *, one for a gasoline station at 118th and Crawford that was signed 'Jerry Barbee' and one for a gas station at 127th and Western, signed 'Jerry Barbee' * * *."

Officer Gorman went to a police station and examined Chicago area telephone directories. He found that a Jerry Barbee was listed as residing at 12802 South Loveland Avenue in Alsip, Illinois. That address was "within the same area" as the two gasoline stations named on the slips found in the automobile, and officer Gorman, joined by three members of the Chicago Police Department and one member of the Alsip Police Department, went there.

When they arrived at approximately 3:00 A.M., officer Gorman saw an automobile in the driveway of the house. He radioed for a check on the automobile's license plates and learned that the plates were registered to Lyman Moore. He testified that he knew the name Lyman Moore as that of a "convicted bank robber."

Two officers went to guard the rear of the house, and the others approached the front door. One had his gun drawn and another had his hand on his gun. They knocked, and Mrs. Barbee answered. Officer Gorman asked whether her husband owned a car similar to the one from which the two men had fled, and she answered that he did. The officer then produced a set of keys which had been taken from the ignition switch of the abandoned car. Mrs. Barbee said that they resembled her husband's keys, and at officer Gorman's request she tried one of the keys in the door of the house. It locked and unlocked the door. He testified: "I asked her if her husband was home and she said, 'No, he is not.' I asked her if we could look for him and she said, 'No, you cannot. You will have to have a search warrant.' "

Some police officers were left to guard the house, while others appeared before a magistrate and obtained a search warrant. At approximately 6:00 or 6:30 A.M., the officers returned to the house with the warrant. The warrant was

read to Mrs. Barbee, who then allowed the officers to enter. The officers entered the house with drawn guns.

Lieutenant Barnes of the Alsip Police Department testified that when he came to the garage, which was connected with the house, "the Chicago policeman was already in there, and on the south side of the garage was an object covered with tarpaulins. We approached the object, lifted up the tarpaulins. At this time we had our revolvers drawn. I was looking for Mr. Barbee. We pulled the tarpaulins off the car and we didn't find him. We found a 1962 red Galaxie Ford convertible. There was no plates on the car and the left front window vent was broken." On the floor were several sets of license plates. A radio check revealed that the car had been reported stolen, and it was for the theft of this car that the defendant was convicted.

Although none of the officers looking for Barbee at his home were aware of the fact, Barbee and Lyman Moore had returned to the automobile left on Artesian Avenue, and had been arrested. These events took place shortly before the officers entered Barbee's home.

At the outset of the hearing on the defendant's motion to suppress, the State's Attorney conceded that the warrant that had been secured was defective. The basis for this concession was the fact that "the warrant was executed by Judge Thorp without having a signed affidavit by the complainant who was Lieutenant Barnes." (Const. of Ill., art. II, sec. 6.) Whether this defect might have been corrected upon a showing that the magistrate actually heard sworn testimony that was sufficient to establish probable cause need not be considered, because no effort was made to amend. (*Cf. Albrecht* v. *United States,* 273 U.S. 1, 71 L. Ed. 505; *People* v. *Harding,* 34 Ill.2d 475, 483.) The concession that the warrant was invalid removed it from consideration as direct authority which justified the conduct of the police officers in entering Barbee's home. The trial

court nevertheless found that the conduct of the officers was reasonable, and did not violate the fourth amendment of the constitution of the United States or section 6 of article II of the constitution of Illinois. We agree with this conclusion.

A police officer may arrest without a warrant "when a criminal offense has in fact been committed, and he has reasonable grounds to believe that the person to be arrested has committed it." (Ill. Rev. Stat. 1961, chap. 38, par. 657; cf. Ill. Rev. Stat. 1965, chap. 38, par. 107—2.) And when an officer is authorized to make an arrest, he is also authorized "to break open a door or window of any building in which the person to be arrested is or is reasonably believed to be, if he is refused admittance after he has announced his authority and purpose." (Code of Crim. Proc., Am. Law Inst. Official Draft (1930) sec. 28; see Ill. Rev. Stat. 1965, chap. 38, par. 107—5(d), which became effective Jan. 1, 1964.) It is of course true that in the present case the officers who entered Barbee's home made no arrest. But this circumstance can not be significant. Just as "a search is not to be made legal by what it turns up," (*United States* v. *Di Re,* 332 U.S. 581, 595, 92 L. Ed. 210,) so the legality of the conduct of the officers in this case is to be determined upon an appraisal of the situation that confronted them, and not upon the success or lack of success of their efforts.

The officers who entered Barbee's home knew that a serious crime had been committed when the shots were fired at officer Clifford. They knew that the person who had fired the shots and his companion had fled, and that at least one of them was armed. It was the duty of the officers to arrest them. We need not decide whether the chain of circumstances that led them to Barbee's home, without more, gave them probable cause to believe that he was involved in the shooting. For if any doubt existed on this score, it was dissipated when the key left in the ignition switch of the

abandoned car opened the door to Barbee's home. At that time they were justified, in our opinion, in entering his home to arrest him. The issue that divided the court in *Ker* v. *California,* 374 U.S. 23, 10 L. Ed. 2d 726, is not present in this case, for here the officers identified themselves and announced their purpose. The fact that they did not immediately enter, but instead attempted to secure a warrant does not, we think, adversely affect the legality of their subsequent entry. The house was guarded while the warrant was being sought, and when the officers finally entered there was no less reason to believe that Barbee was inside the house than when they first approached.

The situation was a most sensitive one, for the defendant's home was involved, and the officers initially came there in the middle of the night. (See Judge Prettyman's comprehensive discussion in *Accarino* v. *United States,* (D.C. cir. 1949) 179 F.2d 456.) But in this case the officers were not dealing with searches for gambling materials, intoxicating liquor or narcotics—the type of cases that has generated so much of the law relating to the legality of searches and seizures. The officers reasonably believed that they were in close pursuit of an armed man who had committed a violent offense of a particularly flagrant type. The "practical demands of effective criminal investigation and law enforcement," (*Elkins* v. *United States,* 364 U.S. 206, 222, 4 L. Ed. 2d 1669,) required that the defendant be apprehended, regardless of the risks involved in arresting him.

We hold, therefore, that the officers were lawfully present in the garage where the stolen car was found. They were not required to overlook the stolen car which was before them in plain view when they had removed the tarpaulins in their search for Barbee. Here, as in *Abel* v. *United States,* 362 U.S. 217, 238, 4 L. Ed. 2d 668, it would be without reason to say that the officer must overlook or return an article subject to lawful seizure "because it was not one of the things it was his business to look for."

The defendant also argues that his conviction was "a nullity because this case was never reinstated by order of court." The record reveals that on April 17, 1963, an order was entered upon the "consent and agreement" of the State's Attorney and the defendant's attorney, striking the case with leave to reinstate. On May 17, the State's Attorney filed a "motion to reinstate the indictment," but no ruling on this motion appears in the record. After the State's motion had been filed, the "case" was continued on six occasions with the consent of the defendant. At the hearing on the defendant's motion to suppress evidence, his attorney remarked: "I believe it was April 26 that the state saw fit to reinstate this charge. Originally it was S.O.L.'d and they have reinstated it." The defendant was tried, convicted, and sentenced without calling the court's attention to its failure to rule on the State's motion.

In *People* v. *Hill,* 17 Ill.2d 112, the defendant was tried without having entered a plea. The court and both parties assumed that a plea of not guilty had been entered, just as the court and parties clearly assumed in this case that the charge had been reinstated. In *Hill,* we overruled a series of decisions that had held the entry of a plea essential to a judgment of conviction. We said, "the solicitude which was once lavished upon formal technicalities is now directed toward matters that are significant in terms of the right of the accused to a fair trial," and we "look[ed] to the record to determine whether or not the omission of a formal plea adversely affected the rights of the defendant." 17 Ill.2d at 119.

We believe that the approach followed in the *Hill* case should be employed in the case before us. The defendant has not suggested that there was any basis for refusing to reinstate the charge against him, and the absence of a formal order of reinstatement did not affect the fairness of his trial. Orderly procedure demands that except in unusual circumstances, an objection to the commencement of a trial

be presented at the earliest opportunity. We hold that the defendant waived any defect arising from the State's failure to reinstate the charge against him.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*