**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190434-U

Order filed August 19, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Iroquois County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0434 Circuit No. 15-CF-108 |
| | ) | |
| JERRY M. PINTELON, | ) ) | Honorable James B. Kinzer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McDADE delivered the judgment of the court.
Justices Daugherity and Holdridge concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  (1) The State's closing argument errors did not rise to the level of second-prong plain error; and (2) defendant's convictions for aggravated discharge of a firearm within 1000 feet of a school and aggravated battery with a firearm violate the one-act, one-crime doctrine.

¶ 2    Defendant, Jerry M. Pintelon, appeals from his convictions for aggravated discharge of a firearm within 1000 feet of a school and aggravated battery with a firearm. Defendant argues that the State committed prosecutorial misconduct during closing argument and that his convictions violate the one-act, one-crime doctrine. We affirm in part and remand with directions.

¶ 3                                   I. BACKGROUND

¶ 4        The State charged defendant by three-count indictment with attempted first degree

murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014)), aggravated discharge of a firearm within

1000 feet of a school (*id.* § 24-1.2(a)(2)), and aggravated battery with a firearm (*id.* § 12-

3.05(e)(1)). Count I alleged that defendant knowingly discharged a 9-millimeter semiautomatic

pistol multiple times at Kylie Schwartz. Count II alleged that defendant, "while located at 112 E.

Ash Street, Watseka, and within 1000 feet of the Nette [*sic*] Davis Elementary School,

knowingly discharged a firearm, a 9mm semiautomatic pistol, in the direction of *** Schwartz."

Count III alleged that defendant "while located at 112 E. Ash Street, Watseka, knowingly and by

means of discharging a firearm, caused injury to *** Schwartz, in that he shot *** Schwartz

three times with a 9mm semiautomatic pistol striking her arm, abdomen, and foot."

¶ 5        The case proceeded to jury trial on May 22, 2018. The jury found defendant not guilty on

count I and guilty on counts II and III. On August 3, 2018, the court granted defendant's motion

for a new trial on counts II and III.

¶ 6        At defendant's second jury trial, Schwartz testified that on August 22, 2015, she and

Arizona Harwood went to the residence of Lawrence Hemp located at 114 East Ash Street in

Watseka. They spent the day outside with friends listening to music. At approximately 10:30

p.m., while Schwartz was talking on her cell phone, she saw a laser light shine on her friend's

face. She described the light as a long red beam directed at the middle of her friend's forehead.

The light moved from the forehead of one friend to the chest of another. Schwartz was told to

run. She bent down to put her cell phone in the bottom of a stroller and heard a gunshot. She

stood and pivoted slightly, facing the east. She observed a male standing with his arm extended

and a red beam of light pointed at her. She put her hands up and said "don't shoot me, don't

shoot me. Please don't shoot me." Schwartz heard another gunshot and froze. She looked down and observed blood pouring from her arm. She heard more gunshots as she fled into the house. She discovered she had been shot in the arm, the side, and the heel. Schwartz identified defendant as the shooter, stating that she watched him shoot her in the arm.

¶ 7    Officer Ryan Garfield of the Watseka Police Department testified that he and Officer Ashley Butt responded to the scene. Garfield and Butt located the victim and called for an ambulance. After the ambulance arrived, Garfield began interviewing witnesses. Defendant told Garfield that he did not know what was happening. When other officers arrived, defendant became very upset and was yelling and screaming. Defendant said to Garfield, "[D]on't you think if I was going to do something like this I would have used my 357? Just blink for 10 minutes and I will have the house burnt to the ground." Defendant was detained due to his agitated state. A neighbor, Joseph Seibring, informed Garfield that he had witnessed the shooting. Defendant's driveway was visible from Seibring's porch, and Seibring identified defendant as the shooter. Defendant was placed into Garfield's patrol vehicle. Defendant began banging his head on the glass divider. Garfield testified that defendant smelled strongly of an alcoholic beverage. In addition to the three bullets that struck Schwartz, a fourth bullet was located in the front exterior wall of the Hemp residence. Four 9-millimeter shell casings were located in defendant's driveway.

¶ 8    Lieutenant Josh King of the Watseka Police Department testified that he searched defendant's residence and located a 9-millimeter Ruger pistol with a laser pointer underneath the mattress in defendant's bedroom. This bedroom contained a door that led directly outside. King retrieved a bullet and bullet fragment, which had been removed from Schwartz, from the hospital

where he went to interview Schwartz. He further testified that defendant's residence was 697 feet from the Nettie Davis School.

¶ 9 Harwood testified that she went to Hemp's residence with her one-year-old daughter and Schwartz. At approximately 10:30 p.m., Harwood saw a large man walk outside of the residence to the east of Hemp's residence. She observed red lasers pointed at two different individuals' foreheads and heard someone ask the man if he had a problem. She heard a gunshot coming from the east. She observed Schwartz's arm bleeding.

¶ 10 Officer Butt of the Watseka Police Department testified that she responded to the shooting with Garfield. She indicated that defendant's emotions were erratic. After defendant was arrested, she transported him to the Iroquois County jail. During the ride, defendant spontaneously declared that "he had no problem shooting a witness or shooting a police officer."

¶ 11 Deputy Drew Watts of the Iroquois County Sheriff's Department testified that while investigating the incident, defendant became angry and was yelling and shouting. Watts observed defendant move very close to another officer's face, coming mere inches from the officer. Defendant made a comment about "clean[ing] up the streets himself if [the officers] were not going to" do anything.

¶ 12 Lieutenant Ryan Morefield of the Iroquois County Sheriff's Department testified that defendant was highly intoxicated, profane, and belligerent. Defendant attempted to entice Morefield to tase defendant. Defendant told Morefield that if they "ha[d] done [their] job the first time, this wouldn't have happened."

¶ 13 Forensic scientist Katherine Sullivan testified that DNA extracted from swabs of the 9-millimeter Ruger pistol matched DNA obtained from defendant's buccal swabs.

4

¶ 14    Forensic scientist Brian Parr testified the bullet removed from Schwartz had been fired from the 9-millimeter Ruger pistol recovered from defendant's bedroom. He determined that the four shell casings found in defendant's driveway matched the Ruger.

¶ 15    Officer Mike Stua of the Watseka Police Department testified that on August 10, 2015, he responded to a complaint of underage drinking at Hemp's residence. He spoke with neighbors regarding this incident, including defendant. Defendant was very agitated and upset about the people at the Hemp residence. He informed Stua that if police would not address the issue, he would. Defendant provided a written statement stating the same. The written statement was admitted into evidence.

¶ 16    Garner testified that he was with defendant the evening of the shooting. They were in defendant's garage drinking and listening to music. At approximately 10:30 p.m., defendant exited the garage and walked toward his residence. While defendant was gone, Garner heard loud noises that he thought might be fireworks accompanied by screaming. Defendant entered the garage and told Garner that he "took care of that problem." Defendant was not holding anything when he returned to the garage. Garner testified that he did not know where defendant went or what he did when he left.

¶ 17    Seibring testified that he resided across the street from defendant. He was on his porch at approximately 10:30 p.m. on August 22, 2015. Nothing obstructed his view of defendant's residence. He heard what he believed to be a firecracker, looked up, and saw defendant shooting a gun toward Hemp's residence. Five or six people and a baby were in the yard. The State rested its case.

¶ 18    Defendant called several witnesses to testify on his behalf. Anne Scharf, James Stafford, and Katelin Garfield testified as character witnesses for defendant. Monica Pintelon, defendant's

5

mother, testified that she noticed a gun and two magazines laying out in defendant's bedroom and put them underneath the mattress on the day of the offense because she knew defendant had people coming to visit and did not want anyone to take the items. Tawny Ganno testified that she had a view of defendant's garage from her backyard. On August 22, 2015, she observed defendant in his garage with friends, drinking and listening to music. That evening, she heard three gunshots. She panicked and went to defendant's garage because she knew he was there with others. Ganno testified that when she arrived at defendant's garage, he was there with two other individuals. They were all calm. From the time she heard the gunshots to the time she saw defendant, approximately three minutes had elapsed.

¶ 19    Defendant testified that on August 22, 2015, various friends and family visited him throughout the day at his residence. In the evening, he and Garner were in his garage drinking and listening to music. Garfield and Butt entered his garage with their guns drawn, and he became aggressive. He told the officers he did not hear or see anything. Defendant testified that he had not left his garage since earlier in the afternoon. More officers arrived and ordered defendant and Garner to the front of the residence. Defendant was upset, yelling, and intoxicated. He was handcuffed and taken to jail.

¶ 20    Defendant indicated that he had previously called the police complaining of noise, underage drinking, and drug use at the Hemp residence. He testified that on August 10, 2015, he gave a written statement to Stua regarding the ongoing problems at Hemp's residence. He read the previously admitted statement for the jury:

> "In the last 4 weeks I have heard multiple verbal fights and some physical. I have seen many young teenagers over next door, 112 East Ash. At most I have seen upwards of 30 people, most minors. They get drugged up and drunk about every

6

day. I am plain down sick and tired of this bullshit. I own my house and pay my taxes. I have two children, one 8 years old and the other 13 years old. I work nights and I fear for the worst that if one of many next door get too messed up they may cause harm to my family and or property. Enough is enough. If I have to resolve this situation myself so it be. I greatly respect my town and officers. It is a shame these people even exist. I want to be proud of Watseka again. I will go through whatever steps need be to see to it that these people know their place. If 10 feet in the ground is what it takes so it be. If further action is needed please do contact me as soon as possible."

¶ 21    Defendant testified that on the night of the shooting, there were five or six people in Hemp's yard and they were not bothering him. He did not call the police that night and had called the police previously, every time he had an issue with the people at the Hemp residence. Defendant was satisfied with the officers handling of the situation on August 10. He did not recall making statements to police about his dissatisfaction with their handling of the nuisance. He denied saying he had no problem shooting a cop or a witness. Defendant testified unequivocally that he did not leave his garage to retrieve the Ruger pistol that was located under his mattress. He did not fire that or any other weapon that night. He did not place the gun under the mattress, and the case in which he collected empty shell casings often came open and spilled shells out around the property and residence.

¶ 22    During closing arguments, the prosecutor argued that Ganno's testimony was consistent with Garner's, and he stated that she "tried to be as honest and forth coming as she could be when she was on the stand." The prosecutor also argued that:

7

"We did hear from [defendant] and if you listen to [defendant] everybody's got to be lying. Everybody except [defendant] has to be lying. Kylie Schwartz has to be lying when she says that she watched him shoot her. Kylie Schwartz has to be lying when she says where the shooter was standing. Arizona Harwood must be lying, she must be lying about the directions that the bullets were coming from. She must be lying about the laser on her friend's faces. Joe Seibring must be lying pretty much about everything that he saw. His entire testimony must be a lie. Ryan Garner, his friend, must be lying when he said oh, no, he left immediately—he left before the shooting came back immediately after. No, Ryan Garner must be lying.

Ryan Garfield must be lying. Ryan Garfield must be lying about this initial encounter where they come around, they see him, they ask him if he heard anything and then they continue on. That must be a lie. Ryan Garfield must be lying when he says the defendant told me don't you think I would use my 357 if I was going to shoot somebody. [Garfield] must be lying when he says the defendant said just blink for 10 minutes and I will have that house burned to the ground. Ashley Butt must be lying. Ashley Butt must be lying when she talks about this initial encounter. Ashley Butt must be lying about I have no problem shooting a witness. Drew Watts must be lying. Drew Watts must be lying about [defendant]'s behavior at the scene. Ryan Morefield must be lying about the scene, about the behavior at the scene, about his comment if you people were just doing your job this wouldn't have happened. Ryan Morefield must be lying about the defendant's behavior when he was taken into custody. Brian Parr, Brian Parr

8

isn't so much lying, he's just completely mistaken, completely mistaken. Been doing this for 20 years, Brian Parr must be mistaken in this case on all of these exhibits.

So all of these people must be getting up here and not telling you the truth. You need to ask yourself why. Why would all these people do that?"

Finally, the prosecutor argued that:

"Going through this it seems the defense is so flimsy, is so transparent it raises the question okay, what are you really trying to tell me? Defense seems to be wink, wink, I didn't shoot her, wink, wink. The cops are incompetent. They need to do more to protect this town. He is hoping you would agree this house is a danger, that it's a shame people like this even exist and you people like this need to know their place and he's hoping you agree that because the incompetent cops are not protecting this town he was justified, justified in shooting a woman on her phone, doing what he did to protect his family. Good people of Watseka in Iroquois County don't need to deal with dope smokers and underage drinkers like Kylie Schwartz, Arizona Harwood ***. He was hoping you would agree with that. ***

*** But do we shoot people for using drugs? Do we shoot people for underage drinking? That's the question being presented to you. These neighbors were annoying with their partying so I shot them. Vigilante justice."

Defendant did not object to any of the State's argument.

¶ 23       The court instructed the jury that closing arguments are not evidence and any statements not based on the evidence are to be disregarded. The jury found defendant guilty on both counts.

Defendant was sentenced to nine years' imprisonment for aggravated battery with a firearm and a concurrent term of six years' imprisonment for aggravated discharge of a firearm within 1000 feet of a school. Defendant filed no postsentencing motion. Defendant appeals.

¶ 24                                   II. ANALYSIS

¶ 25        Defendant argues that the prosecutor committed misconduct during his closing argument by arguing that the jury had to determine the State's witnesses were lying to acquit defendant, accusing defense counsel of presenting an unethical defense, and improperly vouching for the credibility of a witness. Further, defendant argues that his convictions violated the one-act, one-crime doctrine where the convictions stemmed from the same shooting and the State did not apportion the separate gunshots into separate counts or argue at trial that there were separate acts. Defendant acknowledges that he forfeited these issues but argues they are reversible plain errors.

¶ 26        The plain error doctrine permits a reviewing court to remedy a "clear or obvious error" when: (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant contends that his claims of error are reversible under the second prong of the plain error analysis. The first step of the plain error analysis is to determine whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 27                              A. Prosecutorial Misconduct

¶ 28        A prosecutor has wide latitude in closing arguments and may comment on the evidence presented at trial and any fair, reasonable inferences arising therefrom. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Prosecutors may also comment on the credibility of the witnesses so long

10

as the comments are based on the evidence. *People v. Alexander*, 127 Ill. App. 3d 1007, 1077 (1984). However, prosecutors must refrain from making improper, prejudicial arguments and statements. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Even if remarks made during closing argument are improper, "the verdict will not be disturbed unless the remark caused substantial prejudice to the defendant, taking into account the content and context of the comment, its relationship to the evidence, and its effect on defendant's right to a fair and impartial trial." *People v. Johnson*, 208 Ill. 2d 53, 115 (2003).

¶ 29 First, defendant argues that the prosecutor improperly informed the jury that to acquit defendant, they must find that the State's witnesses were lying. The State claims that the argument did not mention acquittal and was merely a comment on the conflicting evidence put forth by defendant's testimony and the State's witnesses.

¶ 30 The record reflects that the prosecutor did not make any reference to acquittal in closing argument. The prosecutor argued to the jurors that they "did hear from [defendant] and if you listen to [defendant] everybody's got to be lying." Where the prosecution's version of the crime and defendant's version vary substantially, the prosecution is allowed to make statements that to "believe defendant the jury would have to believe that everyone else was lying," when those statements are true. *People v. Smith*, 158 Ill. App. 3d 595, 600 (1987)

¶ 31 Here, the prosecutor's statement that the jury must believe that everyone was lying to accept defendant's version of events was not wholly accurate. When viewed in relation to the evidence, a significant portion of the argument highlights variances in testimony between the State's witnesses and defendant, including witnesses who named defendant as the shooter. However, portions of the argument highlight testimony where no substantial variance occurred. Defendant admits to being upset and verbally aggressive which does not contradict evidence

11

given by Watts and Morefield about defendant's behavior on scene. Defendant never testified about the presence or absence of lasers. It does not follow that because he unequivocally denied shooting a gun that day, that Harwood would be lying about seeing lasers on the faces of her friends. Accordingly, we find the prosecutor's statements that do not accurately reflect a substantial variance in testimony to be improper.

¶ 32       Second, defendant argues that the prosecutor improperly accused defense counsel of presenting an unethical defense of vigilante justice. The record does not indicate any unethical behavior on the part of defense counsel, but it does contain clear evidence of defendant's displeasure with the police and the situation at the Hemp residence by way of his statements to police on the night of the offense as well as the written statement he gave to police after the earlier incident. However, defendant had no recollection of some of the statements attributed to him and flatly denied others. He freely admitted his authorship of the written statement, but he testified that he had no issue with the people at Hemp's residence the night of the shooting. Defendant testified that he had called police every time he had an issue and he had been satisfied by their handling of matters on August 10, 2015.

¶ 33       The prosecutor's statements regarding the defense of vigilante justice are not an accusation of unethical behavior but the State's conceptualization of defendant's theory of the case. However, it is clear from the evidence presented that defendant was not putting forth a defense of vigilante justice. The evidence from which the prosecutor based these statements was introduced by the State for the purpose of illustrating defendant's motive. Defendant denied any such motivation. Therefore, it was improper for the prosecutor to attribute this evidence as a defense raised by defendant when all such evidence was introduced by the State and refuted by defendant.

¶ 34 Third, defendant argues that the prosecutor improperly vouched for the credibility of a defense witness, Ganno. "[A] prosecutor may not vouch for the credibility of a government witness or use the credibility of the State's Attorney's office to bolster a witness's testimony." *People v. Effinger*, 2016 IL App (3d) 140203, ¶ 24. In *Effinger*, we found that the State impermissibly vouched for the credibility of its victim witness when it argued that the victim " 'was credible and you should believe her,' " and " 'we believe [the victim is] credible.' " *Id.* ¶ 25. Here, Ganno was a witness for the defense and not for the State; however, the testimony she provided regarding the length of time between the gunshot and her observation of defendant helped the State's case, giving them an interest in having the jury find her credible. The prosecutor informed the jury that he believed Ganno tried to be as honest and forthcoming in her testimony as possible. While this language is not nearly as absolute and direct as the State's comment in *Effinger*, the prosecutor undeniably vouched for Ganno's credibility. Therefore, the prosecutor's argument is improper.

¶ 35 While the State's three comments were improper, this finding alone in insufficient to conclude that they are a clear or obvious or plain error. To constitute a plain error, the remarks must have affected the fairness of defendant's trial or challenged the integrity of the judicial process. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). If this occurs, prejudice is presumed. *Id.* We note that a court may cure the prejudicial effect of improper comments made in closing arguments by instructing the jury that closing arguments are not evidence. *People v. Simms*, 192 Ill. 2d 348, 396 (2000). Absent evidence to the contrary, we presume that the jurors follow the instructions provided by the court. *People v. Green*, 2017 IL App (1st) 152513, ¶ 98.

¶ 36 Following closing arguments, the court instructed the jury that arguments made by the parties were not evidence and any statements not based on the evidence are to be disregarded.

13

There is no evidence in the record to indicate that the jury disregarded this instruction. Moreover, the prosecutor's comments, when viewed in context, although improper, are not plain errors, as the comments were generally related to the evidence.

¶ 37   Finally, defendant argues that the errors in the closing argument constituted three significant acts of prosecutorial misconduct which cumulatively prejudiced defendant. A criminal defendant, regardless of guilt or innocence, is entitled to a fair and impartial trial. *People v. Blue*, 189 Ill. 2d 99, 138 (2000). To determine whether the cumulative effect of several errors deprived a defendant of his right to a fair trial, we employ the same test as the second prong of the plain error test. *Id.* "We ask whether a substantial right has been affected to such a degree that we cannot confidently state that defendant's trial was fundamentally fair." *Id.*

¶ 38   Here, we do not believe that the improper statements called into question the fairness of the trial and integrity of the judicial process as required by the second prong of the plain error analysis. "Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in a defendant's conviction." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). While the State made several improper comments, any potential prejudice caused by these statements was limited by the court's jury instruction. Moreover, these statements were not so egregious, even cumulatively, as to deprive defendant of his right to a fair trial.

¶ 39                                B. One-act, One-crime

¶ 40   Next, defendant argues that his convictions for aggravated discharge of a firearm within 1000 feet of a school and aggravated battery with a firearm violated the one-act, one-crime doctrine. Under the one-act, one-crime doctrine, a defendant may not be convicted of multiple offenses arising out of a single physical act. *People v. King*, 66 Ill. 2d 551, 565-66 (1977). Where

14

the same physical act supports multiple convictions, only the most serious conviction can stand. *People v. Artis*, 232 Ill. 2d 156, 170 (2009).

¶ 41　　　　In determining whether charges arise from the same act, the supreme court has recognized a six-factor test:

> "(1) whether the defendant's actions were interposed by an intervening event; (2) the time interval between the successive parts of the defendant's conduct; (3) the identity of the victim; (4) the similarity of the acts performed; (5) whether the conduct occurred in the same location; and (6) the prosecutorial intent, as shown by the wording of the charging instruments." *People v. Sienkiewicz*, 208 Ill. 2d 1, 7 (2003).

¶ 42　　　　Here, the six *Sienkiewicz* factors establish that both of defendant's convictions derived from a single act. First, there is no intervening event. Defendant stood in his driveway and fired his gun in the direction of Schwartz. Second, the time interval is very small as defendant fired four gunshots in rapid succession. Third, there is a single victim, Schwartz. Fourth, the acts of firing each of the four gunshots in the direction of Schwartz are identical. Fifth, the conduct occurred in the same place, the driveway of defendant's residence. Finally, the charging instrument indicates that the State did not apportion out the individual gunshots to put defendant on notice of their intention to seek multiple convictions. See *People v. Crespo*, 203 Ill. 2d 335, 344-45 (2001). The evidence showed defendant fired four gunshots from his driveway which was located within 1000 feet of a school. One bullet struck Hemp's residence and three struck Schwartz. The charging instrument could have specified that aggravated discharge of a firearm within 1000 feet of a school was the gunshot that struck Hemp's residence and aggravated battery with a firearm was the three gunshots that struck Schwartz. It did not. Accordingly, all

15

six factors weigh in favor of finding that one act occurred and the one-act, one-crime doctrine was violated.

¶ 43    It is well-established that a one-act, one-crime violation affects the integrity of the judicial process, satisfying the second prong of the plain error analysis. *In re Samantha V.*, 234 Ill. 2d 359, 378-79 (2009). Therefore, the lesser of defendant's convictions must be vacated. Where, as here, no differentiation exists between the classification and requisite mental states for both offenses, remand to the circuit court is required for determination as to which conviction shall be retained. See *People v. Calva*, 256 Ill. App. 3d 865, 870 (1993); *Artis*, 232 Ill. 2d at 177. Accordingly, we remand the cause to the circuit court with directions to determine which conviction will be retained and to vacate the conviction and sentence of the less serious offense.

¶ 44                                    III. CONCLUSION

¶ 45    The judgment of the circuit court of Iroquois County is affirmed in part and remanded with directions.

¶ 46    Affirmed in part and remanded with directions.